IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Jose Luis Vite-Cruz,<br><br>Petitioner,<br><br>vs.<br><br>Yadira Del Carmen Sanchez,<br><br>Respondent. | Civil Action No. 3:18-cv-01943-DCC |

**Order Granting Petitioner's Hague Convention Petition and
Requiring the Return of the Child to Mexico**

This matter was initiated by a Verified Petition filed by Petitioner Jose Luis Vite-Cruz ("Father") under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, formerly cited as 42 U.S.C. §§ 11601–11.[1] ECF No. 1.

Having considered the testimony of the witnesses, stipulations of the parties, exhibits and testimony presented at trial, and arguments of counsel, the Court hereby **GRANTS** Father's Hague Convention Petition and hereby **ORDERS** the immediate return of A.V., a twelve-year-old child (the "Child"), to his habitual residence of Hidalgo, Mexico,

---

[1] Both the United States and Mexico are parties to the Hague Convention. The United States became a party when it ratified the Hague Convention in 1988. Hague Convention art. 37. Mexico became a party through accession. *Id.* art. 38. "The distinction between accession and ratification is that only nations that have ratified the Convention can be considered signatories. . . . Accession, by contrast, binds a country only with respect to other nations that accept its particular accession." *Gonzalez v. Gutierrez*, 311 F.3d 942, 945 n.2 (9th Cir. 2002). The United States accepted Mexico's accession, and the Convention entered into force between the two countries in 1991. *See* Hague Conference on Private Int'l Law, Acceptance of Accession, http://www.hcch.net/ (last visited Oct. 1, 2018).

and his Father. To this end, the Court issues the following findings of fact and conclusions of law under Fed. R. Civ. P. 52. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.[2]

## I.    Introduction

The Hague Convention is intended "'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence.'" *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (quoting Hague Convention pmbl.). Importantly, Courts construe the Hague Convention so as to deter parents from unilaterally removing the children from their habitual residence and crossing international boundaries in search of a more sympathetic court to arbitrate custody related disputes. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). The Sixth Circuit Court of Appeals has explained that these goals are aimed at:

> situations where one parent attempts to settle a difficult family situation, and obtain an advantage in any possible future custody struggle, by returning to the parent's native country, or country of preferred residence . . . . Under such circumstances, the Hague Convention is clearly designed to insure that the custody struggle must be carried out, in the first instance, under the laws of the country of habitual residence . . . .

*Friedrich v. Friedrich*, 983 F.2d 1396, 1402–03 (6th Cir. 1993). To further the goals of the Hague Convention, courts are called on to preserve the status quo—the return of the child to his home country for further proceedings. *Miller*, 240 F.3d at 398. To that end, "the return remedy does not alter the pre-existing allocation of custody rights between parents;

_____

[2] The Court issues a separate return order covering such issues as the details of return, the issuance of a passport, and the extension of the Court's preliminary injunction.

the Convention generally leaves ultimate custodial decisions to the courts of the country of habitual residence." *Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016).

Article 12 of the Hague Convention sets forth a "general rule that where appropriate proceedings are commenced within one year of a child being wrongfully removed, a court 'shall order the return of the child forthwith.'" *Id.* However, "the return remedy is not absolute." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). The Hague Convention "provides a limited number of narrow exceptions to the general rule of return." *Alcala*, 826 F.3d at 169. For example, Article 12 of the Hague Convention permits a court to decline return if "it is demonstrated that the child is now settled in its new environment." Hague Convention, Art. 12.  A court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Id.* at Art. 13.

Prior to setting forth its findings of fact and conclusions of law, the Court lauds the parties and lawyers involved in this case. Counsel for both parties, a mediator, and a guardian ad litem have all put countless hours of work into this case without receiving any remuneration. The Court is incredibly grateful to all of the lawyers involved in this case, for they have done an outstanding job and serve as a benchmark of the type of pro bono service and professionalism that all lawyers should strive to achieve. Indeed, the parties have received representation that rivals that of a multimillion dollar commercial dispute. Moreover, the parties have admirably complied with all court orders in this case and have made a good faith effort to resolve the case without Court intervention.

All Hague Convention cases require courts to undertake the unenviable task of determining whether to return a child to another country and necessarily removing him

from residence with one of his parents. Often, these cases involve a malicious abduction undertaken by a parent with ulterior motives. In contrast, this case involves two loving parents that simply want custody of their minor son. This Court, however, is not empowered to make a custody determination. Instead, the Court must interpret and apply an international treaty, which has been ratified and codified by federal law.

Indeed, if this Court were making a custody decision militated by the best interests of the child, the decision might well be very different from the one announced herein. Accordingly, the Court issues this Order with a heavy heart, with full knowledge of the significant ramifications it has for both parents and their minor son. With these prefatory remarks in mind, the Court turns to the findings of fact and conclusions of law.

## II.    Procedural History

1.      Father filed his Hague Convention application in Mexico on or about April 24, 2017.

2.      On June 26, 2018, the Mexican Central Authority certified that Child's removal from Mexico was wrongful.[3]

3.      Father retained *pro bono* counsel and filed a Verified Emergency Petition and ex parte Motion for a Temporary Restraining Order ("TRO") on July 16, 2018, in the District of South Carolina. ECF Nos. 1, 7.

---

[3] Article 15 of the Hague Convention provides: "The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the [Hague] Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination."

4.      On July 17, 2018, the Court held an ex parte telephone conference and indicated that it would issue an expedited TRO prohibiting Respondent Yadira Del Carmen Sanchez ("Mother") from removing the Child from the District of South Carolina pending a preliminary injunction hearing.  ECF No. 13.

5.      The Court held a preliminary injunction hearing on July 24, 2018.  ECF No. 17.  Mother was present at the hearing with the Child.  At the conclusion of the hearing, the Court converted the TRO to a preliminary injunction, continuing the prohibition on Mother removing Child from the District of South Carolina.  ECF No. 17.  On July 27, 2018, the Court issued a written order memorializing its findings.  ECF No. 21.

6.      On July 26, 2018, the Court appointed Elliott B. Daniels[4] and Susan O. Porter, both of Murphy and Grantland, P.A., to represent Mother in this matter.  ECF No. 20.

7.      After appointing Mr. Daniels and Ms. Porter, the Court held a telephone conference with counsel on August 7, 2018, in order to discuss scheduling issues.  ECF No. 22.

8.      Following the entry of a consent scheduling order, the Court appointed Richard Whiting as a Guardian ad Litem ("GAL") for the Child and directed him to prepare a final report prior to the trial in this matter.  ECF No. 26.

9.      The parties participated in mediation on September 12, 2018, and made a good faith effort to resolve the case, although the mediation was ultimately unsuccessful.

---

[4] The Court notes that Mr. Daniels is no longer employed by Murphy and Grantland, as he has joined the United States Attorney's Office.

10. On September 26, 2018, Father filed a Motion in Limine and Objections to the GAL's report, seeking to exclude a variety of evidence contained in the report. ECF No. 37.

11. The parties each submitted proposed Findings of Fact and Conclusions of Law to the Court prior to trial. The parties agreed that the submissions would be ex parte so as not to reveal any trial strategy.

12. The Court held a bench trial on October 4 and 5, 2018, in Columbia, South Carolina. Mother was present in the courtroom, and Father was present via teleconference from Mexico. At the beginning of trial, the Court granted in part and denied in part Father's Motion in Limine. Essentially, the Court held that it would consider the factual findings in the GAL's report to the extent appropriate under the Hague Convention. However, the Court explicitly acknowledged that it was not making a best interests of the child determination, and, thus, the GAL's report would not be considered in the manner typical to family court proceedings.

13. During the two day trial, each party presented witnesses, and, at the conclusion of the trial, the Court met with the Child in chambers without the parties or counsel present.[5] After the bench trial, the parties were provided with a copy of the transcript from the Court's in-chambers meeting with the Child.

14. On November 2, 2018, the Court reconvened the parties and heard closing arguments; the parties then submitted proposed written Findings of Fact and Conclusions

---

[5] The parties stipulated to this in-chambers meeting. The Court met with Child in an informal manner in chambers to have a conversation with him about his living conditions in Mexico and the United States. The only individuals present for this meeting were the Court, a law clerk, a courtroom deputy (who speaks fluent Spanish), and a court reporter.

of Law.  During this hearing, the Court denied Father's Motion for Directed Verdict, which was made during trial.  ECF No. 53.

## III.    Findings of Fact

### A.    Undisputed Facts

15.    Prior to trial, the parties entered into a joint stipulation as to several factual issues, which are set forth below.

16.    Father is the father of the Child and Mother is the mother of Child.  ECF No. 40 at 1.

17.    Child was born in Charleston, South Carolina, on ███████████.  *Id.*  He is a dual-citizen of Mexico and the United States.  *Id.*

18.    Father is a Mexican citizen and resident.  *Id.*

19.    Mother was born in Mexico; has been a Lawful Permanent Resident of the United States since August 19, 1997; and is a resident of Richland County, South Carolina, where she presently resides with the Child.  *Id.*

20.    Child resided for some time in South Carolina from his birth in 2006 until he began residing in the state of Hidalgo, Mexico, with Father.  *Id.* Although the circumstances of Child's initial move from the United States to Mexico with Father are in dispute, the parties agree that the Child lived exclusively in Mexico from the time Child began residing in Mexico until approximately November 2016.  *Id.* at 1–2.

21.    For purposes of the "habitual residence" requirement within the meaning of the Hague Convention, until Child traveled from Mexico to the United States with Mother on or about December 1, 2016, Child was a "habitual resident" of Mexico.  *Id.* at 2.

22.     For purposes of the "exercising custody rights" requirement within the meaning of the Hague Convention, Father and Mother had sufficient rights of custody under Hidalgo and Mexican law as that term is used under the Hague Convention and ICARA. *Id.* Thus, Father was exercising his custody rights within the meaning of the Hague Convention prior to the time Child traveled with Mother from Mexico to the United States on or about December 1, 2016.[6] *Id.*

### B.     Evidence Presented at Trial

23.     The parties do not dispute that Father and Mother were married in the United States in 2005 while living in Charleston County, South Carolina. They have never been formally divorced.

24.     After the Child's birth, Father and Mother traveled to Mexico with the Child in 2006. For approximately four months, the family lived together in Zacualtipán de Ángeles, Hidalgo, Mexico.

25.     Thereafter, Mother and the child traveled to North Charleston, South Carolina. For a period of time while Father remained in Mexico, the Child lived with Mother and her parents in the North Charleston area. In 2008, Father returned to North Charleston, South Carolina. At that time, Mother was in a relationship with another man and was pregnant with his child.

26.     After Father returned to North Charleston, he and Mother lived apart but shared the care and custody of Child. More specifically, Child would stay with Mother for a few days and then go to stay with Father for a few days. This arrangement continued

---

[6] The parties agree that no expert or lay testimony is necessary to establish the aforementioned legal conclusion or the facts to support that determination of foreign law under Fed. R. Civ. P. 44.1.  ECF No. 40 at 2.

for a short while until Mother fell on difficult financial times. When this happened, Child went to live with Father.

27.     Over the next twelve to eighteen months, Mother gave birth and moved several times with her then-boyfriend and her family. During this time, Child continued to live with Father in North Charleston. While Mother testified that Father moved with Child to Mexico in 2008, evidence submitted at trial shows that Father remained in North Charleston well after December 2008. In fact, testimony offered at trial indicated Child continued to live in North Charleston with Father until 2010.

28.     In 2010, Father advised Mother that he was going to move back to Hidalgo, Mexico with Child. Father testified that Mother did not visit Child or help raise him and that the reason for wanting to return to Mexico was to be closer to Child's paternal grandmother, who could provide him assistance with raising Child.

29.     Because Mother opposed the proposed move, Father did not move back to Mexico immediately after their initial discussion. However, when Mother did not visit Child for another month or so, Father proceeded with the plan to move back to Hidalgo, Mexico.

30.     On or about April 2010, Father and Child returned to the same city where the family had lived before: Zacualtipán de Ángeles, Hidalgo, Mexico. At the time of this move, Father had been Child's custodian and caregiver for almost two years in North Charleston. Father continued to be the sole custodian of Child in Mexico from April 2010 until November 28, 2016.

31.     During the roughly six and one-half years Father and Child lived together in Mexico, Mother did not make any effort to support, visit, or communicate with Child or

Father.[7] Mother also conceded that she did not initiate any legal action under the Convention, ICARA, or other authority to have Child returned from Mexico. While Mother testified that she reported Father's taking of Child to law enforcement, she was not able to produce any corroborating evidence for this claim.

32.     As early as 2013, Mother had access to Father's postings on Facebook and was connected to him as a Facebook friend. This status allowed Mother to see Father's postings, including photographs of Child. It also permitted Mother to send electronic messages to Child through the Facebook platform. However, the earliest message from Mother to Child admitted at trial was dated November 8, 2016.

33.     When Mother first contacted Child through Father's Facebook account on November 8, 2016, she asked for his address so she could send Child some gifts. Mother received the address several days later. Mother also asked if she could talk with Child on November 12, 2016. Father arranged for her to speak with Child by phone that same day.

34.     Shortly after Mother began her communications with Child, she made a plan to visit him later that month in Mexico. Mother testified she and her family had already planned to visit their former home in Mexico, and she intended to travel to see Child while there.

35.     Before she left for Mexico, Mother did not advise Child or Father she was going to see Child in late November 2016. Mother did discuss her plans with her boyfriend, ▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮ testified that after Mother left, he was looking forward to Child returning with her to live with them in South Carolina.

---

[7] Mother argues that she did attempt to locate Child. There is no documentary evidence to support this argument.

36.     On or about November 28, 2016, Mother arrived in her former hometown in Mexico. At the time she arrived, Child was ten years old and a well-adjusted young boy who spoke only Spanish.

37.     When she arrived in Hidalgo, Mother went to Child's school and asked to see him. Because the school administrators did not know Mother, they referred her to Father.

38.     Mother then asked Father if she could take Child to the United States to visit with her and her family. Father made it clear he would not consent to Mother taking Child outside of Mexico. However, after a visit to the local police station, Father did consent to Mother taking Child for a short visit with her to a beach in a nearby Mexican town, provided she return Child at a specified date, time, and location. Child also understood and agreed he would go on a short beach trip to get to know his Mother. Mother agreed to these very specific and limited terms.

39.     Mother testified that Father agreed Child could go back to live with Mother in the United States if Child said he wanted to do so during the beach vacation. Father strongly denies this and testified he would never allow such an important decision to be made by a ten year-old without talking to him first, especially when Child had not even seen his mother in more than six and one-half years. Father also pointed out that Child took none of his own clothes, toys or other personal items, which he says shows Child was to come back home after the beach trip.[8]

---

[8] Evidence was presented that Mother obtained Child's school records in Mexico. Father contends this demonstrates Mother's premeditation and motive to unlawfully remove Child from Mexico, while Mother claims she obtained the records in the event Child chose to leave Mexico with her. In light of Child's testimony that he did not make the decision to return to the United States, the Court finds this fact militates in favor of Father.

40. After Mother picked up Child from Father, a friend sent a text message to her asking "Is the boy with you?" Mother responded "Yes - I have five days to convince him to come with me."

41. Contrary to her express agreement with Father, Mother took Child from Mexico to the United States without Father's consent and without telling him they were leaving the country. Father immediately requested that she return Child as promised; however, Mother refused to do so.

42. Mother would later tell Father that during the short time she was with Child in Mexico, Child said he wanted to go live with Mother in the U.S. However, this is in direct conflict with Child's recollection of events. More specifically, during the Court's in-chambers discussion with Child, Child said the first time he ever knew he was even traveling to the United States is when he saw the flag as the bus they were on crossed the border.

43. Unbeknownst to Father, Mother took Child to North Charleston, South Carolina. Mother testified that she was staying in North Charleston temporarily while her permanent residence in Columbia was being renovated. Mother testified that once the renovations were complete, she, Child and several other of her children planned to move back to Columbia where they would all live with ███████████.

44. Shortly after their arrival, on or about December 8, 2016, Mother enrolled Child in fifth grade at Pinehurst Elementary in Charleston County School District One. Child began fifth grade on or about December 12, 2016. In the school's registration form, Mother stated that Child most often spoke Spanish and that Spanish was the primary

language used in their home. Mother did not list Father on the school's registration form as the father of Child.

45.     Despite Father's repeated requests through telephone calls and electronic messaging, Mother refused to provide her and Child's address or any specific information about his wellbeing. Messages from Mother to Father during this time also indicate that she was willfully preventing Father's contact with Child and taunting him when he asked to speak to his son.

46.     Less than two months later, on January 28, 2017, Mother withdrew Child from Pinehurst Elementary and moved from North Charleston to Columbia, South Carolina. Child was then enrolled in Arden Elementary School, his second school in the two months he had been in the United States.

47.     While enrolled at Arden during the spring of 2017, Child made poor grades in his core academic classes and worked with the English for Speakers of Other Languages ("ESOL") program at the school. Child's English proficiency was graded as "Level 1: Pre-Functional" on the spring 2017 English Language Development Assessment, the State's standardized English proficiency test administered by the school.

48.     After the summer break from school, Child enrolled at Crayton Middle School for the sixth grade. Evidence presented at trial shows that Child made two C's and two D's as final grades in his substantive classes for both his fifth and sixth grade years.

49.     During the in-chambers discussion with Child, the Court observed that he can speak English. However, the record reflects that he still needs ESOL classes and accommodations at school.

## IV.     Conclusions of Law

### A. Jurisdiction

This Court has subject-matter jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) and 28 U.S.C. § 1331.

### B. Venue

Venue is proper pursuant to 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b).

### C. Procedural Stipulations

The parties have stipulated that both the United States and Mexico are parties to the Hague Convention. ECF No. 40 at 2. Additionally, the parties worked amicably to stipulate to a streamlined trial procedure, which accommodated the geographic needs of the parties and witnesses.

### D. Father's *Prima Facie* Case

According to the Hague Convention, the removal or retention of a child is wrongful when the removal is in breach of established custody rights defined by the law of the country in which Child was a habitual resident immediately before the removal or retention, and when, at the time of removal, these custodial rights were exercised (either jointly or alone) or would have been so exercised but for the removal. Hague Convention art. 3. To secure the return of an abducted child under the Hague Convention, a petitioner must prove by a preponderance of the evidence that Child has been "wrongfully removed." 22 U.S.C. § 9003(e)(1)(A). Specifically, the petitioner must establish that: (1) Child was "habitually resident" in the petitioner's country of residence at the time of removal; (2) the removal of Child was in breach of the petitioner's custody rights under the law of his home state; and (3) that the petitioner had been exercising those rights at the time of removal. *Miller*, 240 F.3d at 398 n.8 (citing Hague Convention art. 3).

Additionally, a petitioner must establish that Child is under age sixteen at the time they are returned. Hague Convention art. 4.

As stipulated by the parties, Child was a habitual resident of Hidalgo, Mexico, at the time Mother removed him on or about December 1, 2016. Father has rights of custody over Child under Mexican (and specifically, Hidalgo) law. *See* Hague Convention art. 3(a). Both parties agree that Father was exercising his custodial rights at the time Mother removed Child from Mexico. Hague Convention art. 3(b). As a result, Mother's removal of Child from Mexico was a breach of Father's custody rights. Lastly, Child was ten years old when he was taken from Mexico and is currently twelve years of age, which is young enough for the Hague Convention to apply.

Therefore, based on the stipulations and facts properly before the Court, Father has proven a *prima facie* case for the return of Child under the Hague Convention by a preponderance of the evidence.

### E. Mother's Affirmative Defenses

Having established the *prima facie* case for return of Child, the Court turns its focus to the affirmative defenses presented by Mother. For the reasons set forth below, the Court concludes that Mother has failed to carry her burden of proving any defense by a preponderance of the evidence.

### 1. Settled Child Defense

The Court concludes that a preponderance of the evidence does not support the finding that Child is well-settled and that application of this narrow defense is not warranted. *See Alcala*, 826 F.3d at 170. While some evidence may weigh in favor of a

finding that Child is well-settled, there is other and stronger evidence inconsistent with such a finding.

Mother bears the burden of showing, by a preponderance of the evidence, that this action was not commenced within one year of the abduction and Child is now well-settled in South Carolina.[9] Hague Convention art. 12. If so, the abducting parent then bears the burden of establishing that Child is well-settled. The United States State Department has declared that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof" under the well-settled defense. Hague Int'l Child Abduction Convention; Text and Legal Analysis (State Legal Analysis), 51 Fed. Reg. 10494, 10509 (1986) [hereinafter Public Notice 957].[10] Importantly, "[a] removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996). Under the logic of the Hague Convention, "it is the *abduction* that causes the pangs of subsequent return." *Id.*

The Hague Convention and ICARA are silent regarding what factors a court should weigh in making "well-settled" determinations. Because of this lack of statutory guidance, courts should consider "any relevant circumstance that demonstrates security, stability, or permanence—or lack thereof—in a child's new environment. Such a totality of the

---

[9] Petitioner does not contest the fact that his Verified Petition was filed more than one year after the abduction.

[10] As the State Department's official interpretation of the Hague Convention, this Court gives great weight to Public Notice 957's provision narrowly interpreting the well-settled defense. *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982)).

circumstances analysis serves the purpose of the 'settled' exception" . . . . *Alcala*, 826 F.3d at 170–71 (citations omitted). In determining whether a child is well-settled within the meaning of Article 12, Courts have considered a number of factors that bear on whether the child has "significant connections to the new country." Pub. Notice 957, 51 Fed. Reg. at 10509. Some factors may include:

> (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

*In re B. Del C. S. B.*, 559 F.3d 999, 1009 (9th Cir. 2009). There is no formulaic method to scale or weigh any of these factors or considerations. *Alcala,* 826 F.3d at 171. The Court's inquiry is one of a holistic nature in determining whether a child has significant connections demonstrating a secure, stable, and permanent life in his new environment. *Id.*

### a.      Evidence Supporting Well-Settled Determination

Mother argues that several facts support a finding that Child is well-settled.[11] First, as the GAL report indicates, Child has learned some English since he was brought to South Carolina. Indeed, Child's ESOL teacher offered moving testimony about Child's hard work in that regard. Considering the circumstances of Child's abduction and the nature of the American education system, the Court is impressed at Child's progress in assimilating with his peers.

---

[11] The Court notes that it has thoroughly considered Mother's arguments on this exception as presented at arguments and in Father's proposed Findings of Facts and Conclusions of Law. The arguments detailed here are merely a summary of Mother's arguments.

Second, Child is receiving appropriate vaccinations, medical care, and dental care in the United States. There is no question that Mother is a loving parent who attends to Child's material and educational needs. The Court observed Child during the in-chambers meeting and found him to be well groomed, intelligent, and articulate.

Third, Mother submitted evidence that Child has a loving family, including Mother, his five siblings, and his mother's boyfriend. Child regularly spends time with his friends and is very active in his school's jazz ensemble. These family ties and engagement in the community are not insignificant and bear heavily in the Court's evaluation of how well-settled Child is in the United States.

### b. Evidence Opposing Well-Settled Determination

Despite the evidence presented by Mother, there are significant aspects of Child's life in South Carolina that indicate he is not well-settled. First, within the first few months of living in the United States, Mother and Child moved homes and schools twice. At each location, they lived in residences that were not owned by Mother. Instead, they depend solely on Mother's boyfriend, ████████████, to provide financial support for food, housing, clothing and other necessities.[12] Mother testified she does not work, so her and Child's wellbeing is dependent upon Mother's boyfriend, who is undocumented and has no legal obligation to care for them. If Mother and ████████ were to break up, or if ██ ████████ was to lose his job or be deported, it is not known where Mother and Child would live or how she would provide for him and the other five children who live with them. That said, the Court has *no indication* such a situation would arise, as ████████ appears to

---

[12] ████ is an undocumented immigrant. The Court commends the parties and counsel for accommodating his testimony remotely. Unfortunately, in the current political environment, courthouses are not friendly locations for undocumented immigrants.

be a loving father figure who genuinely cares for Child's well-being. However, the Court is constrained to consider the realities of Child's living situation in conducting the well-settled analysis.

Moreover, evidence from Child's schools and testimony at trial show Child lives in a Spanish-speaking household and that Spanish is his primary language. As the Middle District of North Carolina has held:

> [t]his indicates both that the child has not completely acclimated to a culture in which English is the predominant language and that a return to Mexico will not cause language problems common in many cases where the well-settled defense is applied. The child's life in North Carolina is not so different from his life in Mexico that it would be worse to order the child to be uprooted.

*Bobadilla v. Cordero*, Case No. 1:14-cv-205, 2014 WL 3869998, at *3 (M.D.N.C. 2014) (citations and quotations omitted). Of course, Mother does not have to provide Child with the archetypal "white picket fence" home life for Child to be well settled, nor does Child's life have to parallel a Norman Rockwell painting. However, the instability inherent to Mother's failure to work, ███████ immigration status, and Child's life as set forth in this Order bear heavily on the Court's determination of how well-settled Child is.

Another example of Child's life in South Carolina not being well-settled is his need for therapy to help with his adjustment to the new environment. Mother testified that Child needed counseling to help Child deal with behavioral issues since the move from Father's home. Despite this, Mother at various times has not allowed Child to have regular contact with Father by telephone or other means. While Mother "did not conceal the child, this interference with family relationships is inherently disruptive and was particularly disruptive here." *Bobadilla*, 2014 WL 3869998, at *4; *see also Lazano*, 572 U.S. at 17 ("American courts have found as a factual matter that steps taken to promote

concealment can also prevent the stable attachments that make a child 'settled.'" (citations omitted)).

Based on the totality of evidence before the Court, the Court concludes that Child is not well-settled as that term is defined by the Convention. In short, Mother has failed to prove that Child has formed significant connections such that "return would be disruptive with likely harmful effects." *In re Robinson*, 983 F. Supp. 1339, 1345 (D. Colo. 1997).[13] That is so particularly in light of the relatively short amount of time that Child has been present in the United States after Mother's abduction. The Court acknowledges that this inquiry presents a very close question; however, as detailed below, even if the Court found that Child was well-settled, the Court would nonetheless exercise its discretion to order return.

### 2. The Mature Child Objection

Mother argues that Child is sufficiently mature to permit the Court to consider his objections to returning to Mexico. The Court concludes that, regardless of his actual maturity, Mother has failed to present sufficient evidence for the Court to apply this narrow defense. More specifically, Mother has failed to present any evidence showing that Child

---

[13] Mother argues that *Alcala* requires a finding that Child is well-settled. However, *Alcala* is distinguishable from this case in several important respects. First, the child in *Alcala* made "all A's and B's except for one C in Science and Math class in the first term of the year" and also made an A in English without any ESOL accommodations. *Alcala*, 826 F.3d at 167. In fact, the District Court found that the child was "perform[ing] exceptionally well in school." *Id.* Second, unlike Mother in the present case, the abducting parent in *Alcala* "has remained gainfully employed and consistently earned an income" since she moved here with her children. *Id.* Lastly, the *Alcala* court found that the subject child has "substantial family ties in his new environment" and that his mother's family "has strong ties to the local community through successful ownership and operation of various local businesses." *Id.* In sum, the well-settled inquiry is necessarily fact-intensive and subject to the discretion of the trial court; therefore, *Alcala* is not dispositive.

has a particularized objection to living in Mexico sufficient for the Court to take his views into consideration.

Under this affirmative defense, Mother bears the burden of showing, by a preponderance of the evidence, that Child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his] views." Hague Convention art. 13. The Hague Convention "does not set forth a particular age at which a child's opinion should be considered, so the court's inquiry is necessarily fact-based." *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 578 (M.D.N.C. 2010). While the Hague Convention provides that a court may take into account the views of the children, it is not required to accede to those views. *Id.* Indeed, "'[t]he discretionary aspect of this defense is important because of the potential for undue influence by the person who allegedly wrongfully retained the child.'" *Id.* (quoting *Hazbun Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 615 (2002)). For this reason, some courts even suggest that the court should rarely prohibit return based on a child's objections. *Trudrung*, 686 F. Supp. 2d at 578 ("As such, there is a demonstrated disinclination among courts to defer to a child's objection as a basis to deny a petition." (quotation and citation omitted)).

Even if Child is sufficiently mature, the inquiry does not end. A child's "generalized desire" to remain in the United States is "not necessarily sufficient to invoke the exception . . . ." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). Child must "include particularized objections to returning to" the former country of residence. *Id.* Likewise, Child's preference for one parent over another is insufficient. Considering such a preference would place the Court in the position of deciding parental custody, which is prohibited by the Hague Convention and ICARA. *See Hazbun Escaf v.*

*Rodriquez*, 200 F. Supp. 2d 603, 615 (E. D. Va. 2002) ("To accommodate [Child's] preference would be a custody determination that is not at issue in a Hague Convention petition."). Giving consideration to such wishes would place the court in the position of deciding custody which is explicitly not the mandate of a court hearing a wrongful retention case under the Hague Convention.

The Court first concludes that while Child is a well-behaved, bright and friendly twelve year-old, he is not remarkably mature. He is certainly appropriately articulate and intelligent for his age and seems to recognize the importance of this legal proceeding. However, there is insufficient evidence before the Court—whether by expert or other reliable and objective testimony frequently presented in similar cases—that the mature child objection should be considered in this case.

Second, and regardless of the age or maturity of Child, his wishes regarding staying in the United States—as expressed in the GAL report and to the Court *in camera*—are merely preferences for a specific custodial arrangement and geographical location. Moreover, he did not express a particularized objection to returning to live with his Father in Mexico.[14] Because the Court is prohibited from determining an issue of custody, the Court must conclude that Mother has failed to meet her burden on this affirmative defense by a preponderance of the evidence.

### 3.    Consent or Acquiescence

Mother's final affirmative defense raised in her Answer is that Father consented to her removal of Child from Mexico at the time, and/or that Father acquiesced in the removal

---

[14] Child testified in chambers that several children bullied him in Mexico but acknowledged having a core group of friends. Child did not acknowledge any other particularized objections to returning to Mexico.

after the fact. Neither the Hague Convention nor ICARA define consent or acquiescence. "Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow." *Baxter v. Baxter,* 423 F.3d 363, 371 (3rd Cir. 2005). "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* (citing *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001)); *see also Padilla v. Troxell*, 850 F.3d 168 (4th Cir. 2017) (discussing the differences between consent and acquiescence). "Courts have explained that the acquiescence defense often requires more formality than consent; accordingly, to find acquiescence we look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time." *Padilla*, 850 F.3d at 175–76.

Here, the Court holds that Mother has not carried her burden in proving consent or acquiescence. Based on the evidence at trial, Father testified he consented to Mother spending time with Child in Mexico, but that he did not at the time—and has never since—agreed or consented to Mother's taking of Child out of Mexico and to the United States.[15] This testimony is strongly supported by Father's immediate request that Mother return Child after he learned she had taken him to the United States, Father's filing of a Hague Convention application in Mexico shortly after Child was taken, and transcripts of communications between the parents since December 2016 that were admitted as exhibits at trial. Lastly, Child's account of the circumstances surrounding his visit with

---

[15] The Court acknowledges that Mother presented contrary testimony during trial; however, the Court finds Father's testimony more credible on this issue as it is supported by the testimony of Child and documentary evidence admitted at trial.

Mother in Mexico and subsequent move to the United States is inconsistent with the defenses of consent or acquiescence. Therefore, based on the facts and evidence before the Court, Mother has failed to sufficiently prove Father consented or acquiesced to her removal of Child from Mexico.

### F. Alternative Exercise of the Court's Discretion

Analyzing the affirmative defenses does not end the Court's inquiry. Instead, "the courts retain the discretion to order return even if one of the exceptions is proven." *Miller v. Miller*, 240 F.3d 392, 402 (4th Cir. 2001) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)); *see also* Hague Convention art. 18 ("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."); *Lozano v. Alvarez*, 572 U.S. at 18 (Alito, J., concurring) (discussing factors relevant to the exercise of discretion). Exercising its discretion, even in the event one of the affirmative defenses were to apply, the Court concludes that equitable justifications warrant the Court's exercise of its discretion to return Child to Mexico.

This alternative holding is buttressed by the Court's factual finding that Mother abducted Child. While Mother's motives may not have been malicious, the consequences of her actions can be enormous. As the Supreme Court of the United States has noted,

> An abduction can have devastating consequences for a child. Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse. A child abducted by one parent is separated from the second parent and the child's support system. Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues. A child abducted at an early age can experience loss of community and stability, leading to loneliness, anger, and fear of abandonment. Abductions may prevent the child from forming a relationship with the left-behind parent, impairing the child's ability to mature.

*Abbott v. Abbott*, 560 U.S. 1, 21 (2010) (internal citations and quotations omitted).

The Court considers a number of factors in reaching its equitable decision. First, Mother has taken steps to sever Child's relationship with Father, including not disclosing where Child was living, not allowing Child to have any regular contact with the Father, taunting Father about her possession of Child, and not allowing Father to meaningfully participate in Child's life.

Second, if Child remains in the United States, it would be virtually impossible for him to see Father ever again, at least until he reached the age of eighteen. Father is financially prohibited from coming to the United States to see Child or attend a custody hearing. Critically, Father does not have legal status to permit him to visit Child in the United States, while there are no legal prohibitions keeping Mother from visiting Child in Mexico.

Finally, an order denying Father's request to return Child would have the effect of sanctioning Mother's unilateral action to abduct Child in violation of Mexican and international law. As detailed above, the evidence presented indicates Father only consented to Mother visiting with Child for a short, specified time period in Mexico. Mother admits she agreed to these terms but then chose to ignore her agreement so she could take Child to another country where she knew Father could not travel. Put plainly, this is the exact type of behavior that the Hague Convention seeks to prevent.

Mother argues that her actions are justified because Father was the first to take Child to another country without consent. However, courts have consistently rejected this same argument when faced with a parent who "re-abducts" a child instead of seeking redress under the Convention. *See Moreno v. Zank*, 895 F.3d 917, 924 (6th Cir. 2018)

(characterizing re-abduction as a disregard for Convention and threat to a child's well-being); *see also Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006) ("To give a legal advantage to an abductor who has a perfectly good legal remedy in lieu of abduction yet failed to pursue it would be contrary to the Hague Convention's goal of discouraging abductions by denying to the abductor any legal advantage from the abduction.").

An order refusing to return Child to his habitual residence would not only reward the Mother in this case, it could motivate other parents attempting to settle a difficult family situation to resort first to self-help and the protections of a foreign country rather than seeking the aid of the local authorities. This Court cannot allow Mother to take matters into her own hands and effectively minimize or even terminate Father's relationship with Child by bringing him to the United States. Instead, the Court must follow the dictates of the Hague Convention and the equitable considerations present in this case.

Based on the foregoing, the Court alternatively concludes that equitable justifications warrant the Court's exercise of its discretion in granting the Verified Petition and ordering the return of Child to Mexico.

## <u>ORDER</u>

Therefore, it is hereby **ORDERED** that Father's Emergency Verified Petition, ECF No. 1, is **GRANTED** as follows:

(1)     Mother is to immediately return Child to Father in Mexico. The Court will issue a separate, and un-redacted return order contemporaneously with this Order.

(2)     Mother is ordered to cooperate with Mexican Consulate Officials within ten days of this order to obtain passports for Child so that the Mexican Consulate can repatriate Child.

(3) **YADIRA DEL CARMEN SANCHEZ** is permanently prohibited from removing Child from the State of South Carolina without the prior approval of this Court. No person acting in concert or participating with Mother (including, without limitation, ███████████ and/or any of their friends or family members) shall take any action to remove Child from the State of South Carolina. **IF YADIRA DEL CARMEN SANCHEZ REMOVES CHILD, OR CAUSES CHILD TO BE REMOVED, FROM THE STATE OF SOUTH CAROLINA WITHOUT PRIOR APPROVAL OF THIS COURT, A WARRANT FOR HER ARREST SHALL IMMEDIATELY ISSUE.**

(4) The indigent status of Father and Mother, which permitted both to proceed in this Court in forma pauperis, will not be rescinded by this Court for the purpose of any subsequent appeal of the novel questions of law contained in this order. *See* 28 U.S.C. § 753(f).

(5) The Court shall retain jurisdiction over this action.

**IT IS SO ORDERED.**

s/Donald C. Coggins, Jr.
Donald C. Coggins, Jr.
United States District Judge

December 19, 2018.
Columbia, South Carolina